We will move to the last case for today. McCarthy v. City of Cordele Mr. Kaufman May it please the Court, my name is Andrew Kaufman, I represent Roland McCarthy in this employment discrimination case. Roland McCarthy was employed as the city manager of the City of Cordele, Georgia. In the summer of 2021, one of the appellees here, Josh DeRusso, the chairman of the Cordele City Commission, publicly campaigned on bringing his version of racial equity to the City of Cordele. He promised, for example, within 90 days of his election that he would replace my client, Mr. McCarthy, with a black woman to achieve diversity. Upon Mr. DeRusso's swearing in, the City immediately moved to terminate Mr. McCarthy and, in fact, replaced him with a black woman. Appellees do not deny that DeRusso acted with intent. They admit that he aspired to discriminate against Mr. McCarthy. You've alleged in the complaint that DeRusso encouraged the other commissioners to fire him because of his race and replace him with someone of a different race, right? That's correct. The vote on the county commission was along racial lines. That's correct. That DeRusso and another commissioner who had voted to fire him, I understand DeRusso didn't because he's chair and he votes in case of a tie and it wasn't a tie, so three to one vote, right? That's correct. But DeRusso and Reeves, is that right? Reeves. Yes. Reeves had already, someone had already told DeRusso, McCarthy, your client, as I understand the allegations of the complaint, that he would be fired and replaced with a black city manager. Is that right? Yes. Not only Mr. DeRusso advertised that in his social media, but also Commissioner Reeves, before the vote took place, had a conversation with our client where he told him this is what's going to happen. And then after it happens, your client asked if he could return to his former position as finance director and he's told no because you don't look like us. That's correct. Now, same conversation with Mr. DeRusso and Mr. Reeves. And the district court dismisses this complaint on the basis that it doesn't allege what the other unnamed commissioners, the ones we haven't named this morning at least, what was going on in their minds, what their intent was. But as I understand it, what this is turning on is whether your allegations as to everything that happened, the immediate replacement after the taking of those of office, the fact that DeRusso had encouraged the other commissioners to fire because of this race-based plan, whether that's enough to allow, those are plausible facts that would allow reasonable inference that his firing was based on race. That is the thrust of our argument, yes, Your Honor. And I'd say that what essentially happened here is what it appears from the court's order is the court really applied a summary judgment standard to the complaint, obviously without the benefit of any discovery, without the benefit of, you know, taking depositions of the commissioners to know what, if anything, they were thinking about. I mean, just for example, when, you know, these cases, there's no end to the number of reasons that commissioners might offer for why they chose to vote the way they did. All we can do at the complaint stage, because what we have alleged very thoroughly is a race-based decision-making process, we can only infer from those facts what they might have done. For example, they had just two weeks earlier unanimously voted to extend Mr. Barr's contract A different commission, right? Well, some of them were different, not all of them. Certainly, the commissioner, the Well, the commissioner he voted to retain had been there, right? Well, yes. Yes. That's not the complaint, but I believe that to be the case. But we can also infer from those facts that these commissioners, because they spoke with Mr. McCarthy immediately prior to the vote and told him he was going to be replaced with a black female, they must have known this ahead of time. How did Mr. Reeves and Mr. DeRusso know this? Also, they immediately replaced him with Angela Redding, who is a black female. Where did she come from? Right? We can infer that they must have had discussions with her as a candidate, maybe they interviewed her. So there are inferences that could be drawn from the facts that are reasonable. And the only thing this court requires is that the allegations in the complaint plausibly lead to a conclusion that liability could be found. The facts have to be plausible and then the inference to be drawn from those facts has to be reasonable. That's correct. We get all mixed up about where plausibility fits in this. That's what I understand it to be. That's correct, Your Honor, but this is not a difficult case. I mean, this is one where the facts are very detailed. We provided screenshots from Mr. DeRusso's social media. The timing of the case amply demonstrates that there was something that went on that changed the minds of the commissioners to vote against Mr. McCarthy. We know that just the way the court looked at the case, the court referred to a lack of evidence on multiple occasions throughout the order, indicating that what the court was looking for was not merely allegations, but something more substantive. And the court's reliance on two cases in particular, I think, are problematic in the court's analysis. And that would be the case of Matthews v. Columbia County and then Pennington v. the City of Huntsville. Of course, Matthews v. Columbia County is a case involving a five-member commission where, and this is after a jury trial, so that came to this court after a full jury trial, and the only evidence in a specific interrogatory to the jury was that one member of the five-member commission voted with retaliatory intent. And so based on that, this court ruled that, well, you've got to show more than just one member voted with discriminatory intent. And that's an instance where this court criticized our case and said, well, you failed to allege in your complaint that each commissioner voted with discriminatory intent. Of course, that allegation would go to the proof. It would go to the substance of the claim. It would go well beyond, you know, what we refer to as the credit faction case, right, the McDonnell-Douglas. I want to ask you about your individual claim against DeRusso. Our precedent pretty clearly says that you have to be the official decision-maker to be held individually liable, but DeRusso didn't vote to fire McCarthy, so how could he have been the official decision-maker for purposes of individual liability? Well, because this court's precedent also says that if you're not a decision-maker, but if you have exercised your influence over other people who then make a decision relying upon what you have provided to them, that's the cat's paw theory, basically, that an individual can be liable under those circumstances, even though you don't have that power to cast that vote. If you, in a discriminatory fashion, exercise your power as the chair over the commission and you influence other members to vote in a certain way, you can be individually liable for that decision. Yeah, I don't know about that. It seems to me that you have to have been the decision-maker to be individually liable. It may well be that in some instances where we have a defendant who is maybe viewed as technically the final decision-maker, relies heavily on the recommendation of someone else who has the discriminatory intent, that goes to show, for example, that the employer discriminated on the basis of race, a company. It might be that the final decision-maker who just defers to a manager or something didn't have any discriminatory intent, but the recommender did. That can be enough. But I don't think we have any authority for the prospect in this kind of context. So 1983, 1981, and I guess you have a Title VII claim as well, right? Well, we do not have a Title VII in this case. Right, right. Well, I cited the case of Griffin v. The City of Jacksonville. Now, it's an unpublished decision. Yeah, it is unpublished, right. Which indicates it's a case involving cat's ball liability against the municipality. But also we found that if the individual acted in a way that was discriminatory and his influence caused the adverse decision, that that individual can be held liable under 1981. Let me ask you a question about 1981. So 1981 is not about employers, right? It's about anyone impairing a right to contract on the basis of race. That's right. So could you sue someone under a tortious interference claim? Theory, basically, that, you know, I have this contract. Party A has a contract with Party B. And Party C tortiously interferes with that contract on the basis of race. Could you bring that theory under 1981? I think that would be a lot to unpack there, Your Honor. I think that, I guess in theory, if Party B, who terminates the contract, is influenced by Party A, and did no investigation on their own, did nothing to look into the allegations that Party A was... Well, no, just, I mean, you know, the tortious interferer, the tortfeasor who's being sued, calls up the other contracting party and says, I want you to breach this contract and, you know, fire this person or whatever because of their race. So let's assume it's the, you know, 1940s. And you've got someone who is doing business with, you know, you've got one business, white-owned business, that's doing business with a black-owned business. And some other businessman calls that white business owner and says, look, I'm not sending you any customers. I'm not doing anything with you unless you cut off this black business and stop doing business with them. Couldn't that interferer be sued under 1981 for interfering with that contractual relationship? Well, when you put it that way, I would say yes, if they're conspiring with one another and he's basically saying, you either do this my way or I'm not going to do business with you. Yeah, that's the correct answer. And that's actually what the Fifth Circuit held by prior court. So, yes, that's the correct answer. I guess I will say this. The bottom line in this case is sort of what, you know, this court found in a Sertain case, the Sertain versus Hamlin-Terrace. And there the court said very simply that all the allegations have to do is plausibly suggest that the plaintiff suffered an adverse employment action due to intentional racial discrimination. It doesn't require more than that. It doesn't even require a prima facie case. We have the prima facie case plus much more here. So with that, I would ask that you reverse the decision of the district court. Okay, Mr. Hill. Good morning. Good morning. May it please the court, since Iqbal, this court has required complaints to include factual allegations for each essential element of a claim. When an employment discrimination case presents an employment decision made by a multi-member voting body, an essential element of the claim is that a majority of the voting body must have harbored discriminatory animus. Without it, you don't get liability against the city in this case. And that's what's missing from this complaint. Come on. I mean, come on. I mean, these facts are egregious. If they're true. And the allegation, I mean, just let's reverse the races and put this in the 50s or 60s. The notion that you would have someone who campaigns. Let's say we had, you know, unrealistically, we had a black city manager. But, you know, I don't know, maybe that's realistic in some places in Georgia in the 50s or 60s. But someone who campaigns that, you know, we're going to have a white city manager. We need more whites. There are not enough whites. We're going to have a white city commission. Whites need to be running this city. That individual encourages the other commissioners, the voting commissioners, to replace the city manager based on his race. Immediately upon taking office, that's exactly what happens. He asks to go back to his previous position as finance director. He's told by one of the voting commissioners and the chair, no, you can't do that because you don't look like us. And we're going to say that's not, those, first of all, they're super plausible facts. Those are plausible. Okay. I mean, this isn't like predatory pricing or something, you know, that's just fantastical. That economists might say, you know, that doesn't happen in the real world. You know, we can believe that there are these kind of racial appeals. It's been an unfortunate and a horrible reality of life in the South for a long time. And it can go both ways. And so there's nothing implausible about it. And so is it a reasonable inference then from those facts that the voting commissioners who immediately voted to replace this commissioner did so on the basis of race? That's all we have. This is just the pleading stage, failure to state a claim. What am I missing? What you're missing, Your Honor, is what this court said in Matthews v. Columbia County, where the court said that, for one, an unconstitutional motive on the part of one member of a three-member majority in that case is insufficient to impute unconstitutional motive. Yeah, but we've got more than that here. We've got the encouragement on the part of the chair to the other commissioners to do it for this reason, and they immediately do it. And exactly the way... This is really important. Matthews addressed that exact point. Whether one person influenced, for an unconstitutional reason, whether one council member influenced the others to vote, and what this court said in Matthews, they used their names, so Titus, Ford, and Reynolds, these are council members, that Titus and Ford may have known about the unconstitutional basis of Reynolds' selection and vote, or that Reynolds may have affected Titus and Ford's votes by his influence is not enough to show that they ratified the unlawful basis. But what the complaint is alleging is that the encouragement was to do this on the basis of a race and to replace them with someone of a different race, right? Which is precisely then what happens. It says all of that together does not matter. No, no, no, he doesn't say the things that I just added, which were that, hey, y'all, this guy needs to go because he's white. He needs to be replaced with someone who is black. Immediately, that's what happens. He is fired, and he is replaced by someone of a different race. And we know at least one of the others has told the plaintiff, oh, no, you can't go back to your previous, first of all, he's told it beforehand, you're going to be replaced with someone of a different race. Exactly what happens. Presumably, he knows that from having talked with the other voting commissioners in the majority. Huh? I mean, all of this is in there? All of this is in the press that you're reading for? I didn't hear all this. Good grief, what happened? In addition to what I did read from Matthews, it does say that even if one person, for an unconstitutional reason, influences other council members to vote the way he wants, and they know it's for an unconstitutional reason, and they're affected by it, Matthews says that that itself is not enough to show that those voting council members had an impermissible motive. I guess here's the issue I have. Unlike yesterday, when I didn't understand the plaintiff's complaint, I do understand it today. It just seems like you're not willing to give an inference to the plaintiff here. You know, the plaintiff has alleged these very specific facts that Chief Justice Pryor is talking about, and it seems like an inference that you would draw in the plaintiff's favor is that this is the reason these specific people voted in this way, and it may be that the evidence comes in and there's not, you know, they had some other reason or whatever, but at this point, we're just looking at inferences that can be drawn, and why isn't that a reasonable inference? Well, for one, that depends on the allegation that the chairman led, directed, and encouraged the others, right? That's the allegation. We have to take that as true. That is their opinion. That's their allegation. We have to take it as true. Okay. For one, the chairman of the commission is not like a mayor or a governor or a president. We're not talking about a supreme executive who has control over other members. He's one commissioner, an elected official like the others. He can't remove them from office. He can't discipline them or suspend them. He has no control over them under the charter, which is a matter that the court can take judicial notice of. So it's not—I think it would be a different type of case if we had someone running for a supreme executive position where they made promises on something he had— Let me ask you something, all right? So let's say it's Republicans and Democrats, right? And it's exactly the setup you're talking about. The chair doesn't have any power over the others. He's just the presiding official at meetings, that sort of thing. And he just—you know, he says to his fellow Republicans or his fellow Democrats, whatever the majority is, you know, I think we need a city manager who shares our political affiliation. Totally plausible. I mean, everyday politics in America, right? The only difference here is that it was a racial point. And an unfortunate reality in America is that that kind of tribalism exists in our country too, right? So I don't see where that gets you anywhere. Just the fact that he doesn't exercise control doesn't mean that it's not a reasonable inference that his encouragement of racial identity was persuasive to his fellow commissioners in the same way that it would be in a partisan setting. That's still a cast-call theory, Your Honor, which, as the Supreme Court has said, has no application when we're talking about legislative bodies. And that is consistent with what this Court has already held pre-Bernovich and Matthews. Let me ask you this. To go back to the plausibility and inference issue, I mean, let's say he—I mean, I feel like part of the problem here is that he alleged so many facts that the district court sort of thought she was at summary judgment. But, like, you usually see these complaints and they just say something along the lines of I was fired and replaced by someone of a different race, and here's kind of a scattering of things that I think make it plausible that my race had something to do with that.  Other people of another race were mean to me. My supervisor was of another race. You know, there was racial talk in the office, stuff like that. That's the usual complaint that you see. And, you know, 100 out of 100 times, we say, okay, that's enough to get to have an inference that you were fired for that reason. Why isn't that the same thing here? Why would you have to allege specifically evidence that would show that each individual decision-maker agreed when, you know, you allege that you were fired and that you were replaced by someone else of a different race and that there's some racial stuff going on? To address that, three points, Your Honor. First, I would look directly to language in Pickleball, which was also a claim of race discrimination, which also had egregious facts that the court said it was troubled by and indicated, you know, suggested there could be some discrimination going on, just not by the specific decision-makers in that case. But, I mean, that's the difference between some discriminatory intent that might exist for much low-ranking officials and attributing that to very high-ranking officials of the federal government, right? Sure. That's not like this. A small town, rural county, where the fellow commissioners get together and have a common motivation. I can show you how it is like that. This is to read directly from Iqbal. Petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic. Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioner's discriminatory state of mind. His pleadings, thus, do not meet the standard necessary to comply with Rule 8. So, to put that into the context of this case. Yeah, look, there's nothing in that complaint that would suggest that John Ashcroft was engaged in profiling, okay? That's very different from a complaint that alleges that the chair of this commission in a rural part of Georgia, you know, got with fellow commissioners, one of whom we have racist admissions from, according to the complaint. Again, we're taking all of this as true. I don't know what the truth is. But the notion that he successfully persuaded them to fire the city manager because of his race and replace him with someone of a different race is worlds away from the John Ashcroft situation. I think to follow the plaintiff's theory would require this court to take the presumption that three black city commissioners voted for a black city manager because of her race. And there is nothing in the complaint to say that. After having been encouraged to do so by the newly elected chair who had campaigned on that very promise and promised to do it and knowing that at least one of them had been so persuaded based on, taking it as true, his own admissions. But the court in Matthews said it doesn't matter. It's unreasonable, unreasonable to infer based on those facts that the others did the same thing that Reeves did. That they, too, had been persuaded by DeRosa. Because there's clearly enough to suggest here that Reeves had been so persuaded. Why would it be reasonable to suggest that Commissioner Shaffer and Robbins, who aren't even mentioned by name, adopted DeRoso's view? Because the complaint alleges that he encouraged them to do it and that that's exactly what they did. It's not like they had conducted a nationwide search for a new city manager or a statewide search or even a county search. They had someone lined up of exactly the race that had been promised and a different race. Look, you can't just isolate that out. It's everything taken together. What were the other two arguments that you were going to make in response to my question? I'm sorry to ask it. Can you repeat what the question was? Well, yes. The way this started is I... Well, let me ask you something else. So on the 1981 claim against the individual, I realized that the individual was not an employer, right? But does an individual have to be a party to the contract under 1981 to deny someone the full and equal benefit of the right to contract, the performance of contract, et cetera, on the basis of race? I'm not 100% sure on the answer. I remember you were asking about towards this interference. I'm not totally sure how I would play in this. If I could finish this last thought. If we are talking about the validity of the contract, that was something that we did raise below where there was on-point authority by the Georgia Supreme Court that it was an ultra-virus contract. It was never even... So this is his employment contract that he says he got, like, whatever, two weeks before. Okay, I'm sorry. That was attached to the complaint, and we did present that to the district court. She just declined supplemental jurisdiction over it because it was a state claim. Right. He never actually entered into a valid contract. And that's a question of law, not fact. Okay. Thank you. Okay, Mr. Kaufman. If any members of the panel have questions, I'm happy to answer those. I don't see the need to belabor the case any further. I don't have any. Do you, Ben? Maybe not. Nor do my colleagues. We'll be in recess until tomorrow. All rise.